IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

IN THE MATTER OF ARREST
WARRANTS, THE SEARCH OF A WHITE
IPHONE6+ SEIZED FROM JOSHUA
LALREMPUIA, AND THE SEARCH OF A
CELLULAR TELEPHONE WITH THE
NUMBER 401-275-3024 USED BY
SRINIVAS ITAPE

Case No. _1:18 MJ 426 LDA_

## AFFIDAVIT

I, Rachel L. Robinson, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for search warrants authorizing the examination of property—electronic devices—and the extraction from that property of electronically stored information described in Attachment B.

2. I also make this affidavit in support of complaints and arrest warrants for Joshua Lalrempuia (DOB 1999) and Vishal Chettri (DOB 1998). As will be shown below, there is probable cause to believe that beginning on a date unknown, but at least as early as on or about October 15, 2018, and continuing until on or about November 19, 2018, Bishwaheet Jha, Sumit Jha, Joshua Lalrempuia, Vishal Chettri and others committed bank fraud, wire fraud, and mail fraud, in violation of 18 U.S.C. §§ 1341, 1343, and 1344, aggravated identity theft, in violation of 18 U.S.C. § 1028A, and conspiracy to commit mail fraud, wire fraud, and bank fraud, in violation of 18 U.S.C. § 1349. On November 21, 2018, U.S. Magistrate Judge Patricia A.

Sullivan signed arrest warrants authorizing the arrest of Bishwajeet Jha and Sumit Jha for the above-listed offenses.

3.     I am a Special Agent/Criminal Investigator with the United States Department of Homeland Security, Homeland Security Investigations ("HSI"), and as a Special Agent of the United States Department of Homeland Security, I am authorized as an officer of the United States to conduct investigations and make arrests for offenses enumerated in Titles 8, 18, and 19 of the United States Code. I have been employed by HSI since May 2007. Prior to that assignment, I was employed as a Customs and Border Protection Officer with Customs and Border Protection for over 4 years. I am currently assigned to conduct investigations in the Resident Agent in Charge (RAC) Providence Office of HSI. I have prepared numerous affidavits in support of applications for federal search and arrest warrants. As a federal agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

4.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

**IDENTIFICATION OF THE DEVICES TO BE EXAMINED**

5.     The property to be searched and/or seized are:

   a.   A white Apple iPhone6+, model #A1524, IMEI 359198072180135, hereinafter "Device 1." Device 1 is currently in the custody of Homeland Security Investigations.

2

b.  The cellular telephone assigned telephone number (401) 275-3024, hereinafter

"Device 2." Device 2 is currently believed to be in the custody of Srinivas Itape.

6.      The applied-for warrants would authorize the forensic examination of the Devices

for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

7.      On November 13, 2018, Newport Police Detective Scott Moody received

information from the Westfield, MA and Acushnet, MA police departments regarding fraud

victims who had transferred funds to residents of 5 Enterprise Court, Newport, RI 02840.

8.      According to a Westfield Police Department detective, J.P., a 66 year-old woman

from Westfield, MA, reported receiving a phone call on October 15, 2018 from an individual

claiming to be selling tech support for $800 for four years.  J.P. accepted the offer and paid the

$800 by providing her bank account information.  Ten days later J.P. received another call

purportedly from the tech support company in which the company claimed that they had

accidentally deposited $48,000 into her account.  The individual requested that J.P. send a

cashier's check to "Bishwajeet Kumarjha" at 5 Enterprise Court, Newport, RI.  The individual

told J.P. to make the check payable in the amount of $47,000 and to keep $1,000 for her troubles.

J.P. complied and mailed a check to Bishwajeet Jha.

9.      On November 5, 2018, J.P. received a follow up call from an individual claiming

that the check would not clear.  The individual requested that J.P. send the funds through a wire

transfer.  J.P. went to her bank to perform the wire transfer, but learned that the purported

mistaken $48,000 deposit into her account was fraudulent.  At that time, J.P. reported the fraud

to the Westfield, MA police department.

3

10.    Law enforcement obtained a copy of the $47,000 cashier's check mailed payable to Bishwajeet Jha. The check was deposited into an account at TD Bank in Middletown, RI. A Westfield detective told Det. Moody that he obtained images depicting a Middle Eastern male depositing the check. Det. Moody later identified this male as Bishwajeet Jha.

11.    Acushnet, MA police department described a similar scheme to Det. Moody involving victims J.H. and K.H., two 71 year-old individuals. According to J.H. and K.H., on November 2, 2018, K.H. saw a pop-up screen on her computer from what she believed to be a virus software website. The pop-up advised that the company was going out of business and required her bank account information to refund her money. K.H. clicked the browser and provided her bank account information. Moments later an image of what K.H. thought was her bank account showed a balance of $159,000. Seconds later the screen shot changed to show a balance of $0. K.H. received a message asking that she provide her cell phone number so she could receive instructions or she would lose all of her money.

12.    K.H. and J.H. received several phone calls from an individual purporting to be "Steven Rogers" demanding that they send money to several different locations over the next couple of days. K.H. and J.H. complied. Based upon instructions received from "Steven Rogers," they sent the following:

  a. On November 2, 2018, K.H. and J.H. overnighted via UPS $40,000 to Marine Marco at 1050 West Irving Park, Bensenville, IL 60106. According to Acushnet police report, the package was delivered at 8:55 a.m. on November 3, 2018 and was signed for by Marco.

  b. On or about November 3, 2018, K.H. and J.H. purchased 19 individual $1,000 gift cards from Target at the direction of "Steven Rogers." Following his instructions, they took pictures of the cards, uploaded them to their computer, and provided access to the cards to "Steven Rogers." All of these cards now contain a zero balance.

4

c. On November 5, 2018, K.H. and J.H. wired $38,500 from their account at St. Anne's Credit Union to Vishal Chettri of 5 Enterprise Court, Newport, RI. They wired the money to Bank Newport Acct. # xxxx-xxxx-4723 for Vishal Chettri.

d. On November 7, 2018, K.H. and J.H. sent two separate international wire transfers totaling $76,800 to two accounts at a bank in Bangkok, Thailand. After completing the wire transfer requests, K.H. and J.H. were contacted by a Citizen bank representative who said the transfers were flagged as possible fraudulent activity. After hearing K.H. and J.H.'s story, the bank representative advised them this was likely a fraudulent situation and that that they should go to the police. K.H. and J.H. then reported the matter to the Acushnet, MA police department.

**The Trash Pull and the Search Warrant**

13. Based upon this information, Det. Moody began an investigation with agents from Naval Criminal Investigative Service ("NCIS"). Bank Newport confirmed for Det. Moody that Vishal Chettri lived at 5 Enterprise Court and had an account at Bank Newport. An agent with NCIS conducted a trash pull at 5 Enterprise Court on November 16, 2018. In the trash, he located documents for Bishwajeet Jha from Bank of America, Santander Bank, and Bank Newport. The document addressed to Bishwajeet Jha from Santander provided that funds associated with a $30,000 check deposited into his account on October 16, 2018 would not be immediately available because the bank could not verify the funds.

14. On November 19, 2018, Det. Moody obtained a state search warrant for 5 Enterprise Court authorizing the search and seizure of documents and electronic devices. That same day officers with Newport Police Department and NCIS executed the warrant.

15. When officers arrived to 5 Enterprise Court, Bishwajeet Jha answered the door. There were nine individuals present in the residence. Officers secured all nine individuals during the search. The residence had four upstairs bedrooms and the living room appeared to be used as a bedroom. There were mattresses on the floor of the living room and bedroom.

5

16.     Det. Moody advised Bishwajeet Jha of his rights and began to speak to him about the reported fraudulent activity.  Bishwajeet Jha denied any involvement in fraud.  Det. Moody searched the second floor bedroom at the top of the stairs straight ahead.  In this room, later identified as Srinivas Itape's room, Det. Moody located and seized bank documents related to Bishwajeet Jha, Vishal Chettri, and Sumit Jha among others.  Specifically, Det. Moody found the following:

a.  Bank Newport account statement for an account in the name of Vishal Chettri. The statement showed a domestic wire deposit into the account from J.H. in the amount of $38,500 on November 5, 2018.

b.  Bank Newport account statement for an account in the name of Bishwajeet Jha. The statement showed a domestic wire deposit into the account from H.S. in the amount of $30,000 on October 23, 2018.  That same day there was a $4,000 withdrawal.  On October 24, 2018, there was a wire transfer in the amount of $25,400 out of Bishwajeet Jha's account to a JP Morgan account in the name of US OffPrice, Inc.  Det. Moody subsequently checked with JP Morgan regarding this account and learned that nearly all of the funds had been withdrawn from the JP Morgan account.

c.  A letter from Savings Institute Bank & Trust to Vishal Chettri.  It advised that a $59,200 check dated 11/12/18, made payable to Chettri, and signed by "Sumit Jha" was returned and should not be credited towards his account balance.

17.     Other officers searched other bedrooms.  In another bedroom, at the top of the stairs to the right, later identified as Joshua Lalrempuia's bedroom, there were numerous bank documents in the names of various individuals including Bishwajeet Jha and Joshua Lalrempuia ("Lalrempuia").  One such document was a Santander bank record reflecting a wire transfer by Lalrempuia to a Chase bank account in the name of US OffPrice, Inc.  The wire transfer was in the amount of $19,700 and dated November 15, 2018.

18.     One of the nine individuals in the residence was identified as Sumit Jha.  A Newport detective, who was searching what appeared to be Sumit Jha's area of the living room,

began to speak with Sumit Jha. The detective located bank documents and Sumit Jha's cell phone, which he seized. Sumit Jha identified his area of the living room and agreed to speak with the detective. He told the detective that Bishwajeet Jha had approached him about participating in the scheme. He said that he received money, forwarded money, and kept some of the money he received. The detective asked Sumit Jha if he would come to the station to speak with him further. He agreed and was later interviewed at the station.

**Interview of Sumit Jha**

19.  During his interview at the station, Sumit Jha said Bishwajeet Jha contacted him about making money. He said he began participating in October 2018. At Bishwajeet Jha's request, Sumit Jha opened a bank account at Santander. Sumit Jha admitted to knowing that the scheme was wrong. He described receiving funds from individuals and then transferring some of those funds to an account in the name of US OffPrice. He said he did not know who was associated with the US OffPrice account. He claimed that he told Bishwajeet Jha that he did not want to participate in the scheme any longer on November 15.

**Interview of Bishwajeet Jha**

20.  Det. Moody arrested Bishwajeet Jha on the scene and transported him to the police station. After he was processed, officers placed him in an interview room to speak with detectives. Detectives advised Bishwajeet Jha of his rights and obtained consent to search his phone and his residence, a room at the Rodeway Inn in Middletown, RI. Det. Moody and other detectives interviewed him. During the interview, Bishwajeet Jha said an individual he knew from India, Abishek Kumar, approached him about participating in the scheme. He said he communicated with Abishek via WhatsApp. Bishwajeet Jha said the scheme involved opening bank accounts, receiving funds, and transferring a large portion of those funds to the US OffPrice

account at JP Morgan. He said the main person behind the scam was the person associated with US OffPrice. He estimated that he had received funds approximately 6 times since he began participating, and he said that he transferred more than $100,000 to US OffPrice.

**Interview of Vishal Chettri**

21.    On November 20, 2018, Vishal Chettri and Joshua Lalrempuia came to the Newport Police Department. Det. Moody and LT Michael Naylor interviewed them. Both were advised of their rights prior to their interviews.

22.    Chettri said he lived at 5 Enterprise Court. He said that "Seenu" (Itape) lived in the bedroom at the top of the stairs, straight ahead, at 5 Enterprise Court, and that Lalrempuia's room was the bedroom at the top of the stairs to the right.

23.    According to Chettri, when he moved into 5 Enterprise Court near the end of October, Bishwajeet Jha approached him about participating in the scheme. Bishwajeet Jha told Chettri that Chettri would make 8% of the funds obtained for his participation. He estimated that he began participating about three weeks prior to his interview on November 20. According to Chettri, Bishwajeet Jha, Sumit Jha and Lalrempuia conducted bank transactions. Bishwajeet Jha was "leading" everyone. Chettri said Bishwajeet Jha knew when the funds were coming into bank accounts. Chettri admitted to opening accounts, but he said he never actually transferred funds. He explained that he received approximately $20,000 into an account at Bank Newport but when he tried to conduct a transaction with the funds, he learned that his account was blocked and the money taken away. He said he received a $59,000 check in the mail, which he deposited. He said that check was supposed to clear on November 20, but that he had not touched the funds yet. Chettri said he received another check in the mail, but that the funds were not available until November 26.

8

24.     At one point he claimed that he did not know that this was wrong. When asked when he learned this was a scam, Chettri said two to three weeks prior to his November 20 interview Josh had a problem with a transaction. Chettri said he was a little bit suspicious. He said that after that day he decided to move out.

25.     Chettri provided consent to search his phone. He also logged into a bank account online and showed detectives account information on his phone related to a Citizens Bank account with $59,000 in it.

**Interview of Joshua Lalrempuia**

26.     Lalrempuia said he lived at 5 Enterprise Court. He said the bedroom at the top of the stairs to the right was his bedroom. Lalrempuia said he became involved when Bishwajeet Jha asked him if he wanted to earn some money. Lalrempuia explained that he just wanted to earn some money. He said Bishwajeet Jha told him he had to open some bank accounts and that money would be coming in. Lalrempuia said he asked Bishwajeet Jha if this was illegal and Bishwajeet Jha said, "no," it's "fine." Lalrempuia said he opened two accounts, one at TD Bank and one at Santander. He said each account received a wire transfer in the amount of $24,700. He said that he was instructed to withdraw $5000 cash from each account. He was allowed to keep 8% of the money and the rest he sent via Western Union to a location in India. He said he made $3,900 in total. Lalrempuia wired the remaining funds to the US OffPrice account. Lalrempuia claimed that he thought receiving 8% of the funds deposited into his accounts for receiving the deposits and transferring funds seemed "fair" to him.

27.     Lalrempuia said he told Bishwajeet Jha that he did not think this was legal and that they were going to get in trouble. He said his TD Bank account was blocked, and he told Bishwajeet Jha that he wanted to get out about two or two and half weeks prior to his November

interview. Lalrempuia said the only people involved in the scheme were Bishwajeet Jha, Sumit Jha, Chettri and himself. At one point in the interview Lalrempuia admitted he knew it was illegal, then he said he did not understand.

28.     During the interview, Lalrempuia had his cell phone, Device 1, on his person. Lalrempuia used Device 1 to check his bank account in the presence of detectives. He then turned it over to Det. Head and Det. Moody, but he refused to sign consent to search his cell phone. Given the nature of the offense and Det. Moody's training and experience as an 11 year veteran of the NPD, and considering the fact that Lalrempuia admitted to providing his bank account information to Bishwajeet Jha which is corroborated by WhatsApp conversations on Jha's cell phone, Det. Moody and I believe that Lalrempuia used Device 1 to communicate with other members of the conspiracy.

**Search of Bishwajeet Jha's Cell Phone**

29.     Det. Lavallee and Det. Moody subsequently searched Bishwajeet Jha's cell phone. During his review of the contents, Det. Lavallee noted that Bishwajeet Jha used WhatsApp to communicate with other individuals who were participating in the scheme. WhatsApp is a smart phone application used to communicate in an encrypted fashion. There were numerous WhatsApp conversations in Bishwajeet Jha's phone that appeared to relate to the scheme. Some of the messages were in English and some were phonetic spellings of Hindi words. The WhatsApp conversations also included photographs or screenshots of financial transactions, other financial documents such as checks and bank receipts, and photographs of driver's licenses of unknown individuals. The conversations also included information regarding individuals later identified as victims. For example, the conversations included some of the following:

a.  Image of a driver's license in the name of D.O., a resident of Sleepy Hollow, NY born in 1939. Det. Lavallee spoke with D.O. on the telephone and learned that she had wire transferred $24,800 to Lalrempuia's First Mass Bank (now TD Bank) Account #xxx-xxx-2183. On November 21, 2018, Detective Lavallee spoke with D.O. She confirmed she did wire money to Joshua Lalrempuia, then realized she was the victim of a scam. Detective Lavallee requested the details of how the scam was run and how D.O. determined she had been scammed. D.O. said she was having difficulty recalling the exact sequence of events and did not feel she could give an accurate account of events at that time. She stated she needed some time to gather her thoughts and the associated documents. On November 30, 2018, Detective Lavallee received a call from a man identifying himself as the Mike Gomez, of CitiBank, D.O.'s bank in New York. Gomez did confirm that D.O. had come into the bank after speaking with Detective Lavallee and stated she was the victim of a scam. Gomez wanted to confirm that D.O. was indeed speaking with law enforcement so he could better assist her. On December 3, 2018, D.O. called Detective Lavallee and stated she had gathered her thoughts and some paperwork associated with this scam. D.O. said that in the beginning of November, she received a phone call from a man with a foreign accent. The man advised her that her computer protection plan was going to be cancelled and she was due a refund. D.O. said she could not recall any of the following events that led to the wire transfer, but did recall sending a wire transfer for $24,800 to Joshua Lalrempuia. D.O. said on 11/27/18, she was directed to send a second wire transfer to Bangkok in the amount of $32,400. D.O. could not recall the particulars of the scheme and even stated that she was, "forgetful." Detective Lavallee advised D.O. of the methods used by the suspects in other instances and asked if those methods sounded familiar. D.O. responded, "Oh yes, I do remember…" D.O. confirmed that the suspect(s) were allowed remote access to her computer and she believed they overpaid her a refund. She was instructed to wire the overpayment ($24,800) to Lalrempuia. Detective Lavallee asked if the same methods were used to convince her to wire the $32,400 to Bangkok. D.O. responded, "I don't know. I don't remember what you said." She again acknowledged her memory was poor. It should be noted that Detective Lavallee advised D.O. on 11/21/18, that she was the victim of a scam involving wire transfers, yet on 11/27/18, she again wired more money as the scheme continued.

b.  Image of a driver's license of D.N., a resident of Hellertown, PA born in 1958, and a screenshot of a wire transfer of $20,000 from D.N. to a Santander account on October 29, 2018. Det. Lavallee spoke to D.N. and learned that he had wired $15,000 to a bank account in South Carolina. On November 30, 2018, Detective Lavallee spoke with D.N who explained that he was contacted by someone selling computer protection. Some time later, he was again called and advised that the computer protection company was going out of business and he was due a refund for $499. He then allowed the suspect remote access to his computer and was told that he was actually refunded $20,499. He was then instructed to wire the

11

$20,000 overpayment to Bishwajeet. He said he did so, but the transfer did not go through, which the suspect told him was because he spelled the name wrong. He was then instructed to wire $15,000 to a TD Bank account # 4357123599, in the name of Justine Gai Patterson, of 839 William Hilton Parkway, unit 103, Hilton Head Island, SC. D.N said he did wire that money. He further stated he has been communicating with someone named, "Mark." Mark utilizes telephone number 239-444-8650 and was expecting a call from D.N. that evening.

c. Image of a blank check from an account in the name of US OffPrice, Inc.

**The WhatsApp Conversation between Bishwajeet Jha and Chettri**

30. On November 2, 2018, Chettri and Bishwajeet Jha began a WhatsApp conversation. The conversation lasted until November 19, 2018. Much of the conversation is in phonetic Hindi and has not been translated yet, but the portion that is in English appears to relate to the scheme.

31. On November 2, 2018, Bishwajeet Jha messaged Chettri his bank account information for Bank Newport. The next day Chettri sent his Bank Newport account information to Bishwajeet.

32. On November 4, 2018, Bishwajeet Jha sent Chettri a picture of a Berkshire Bank check payable to "Bishwajeet Kumarjha" in the amount of $47,000. The check was dated November 2, 2018 and is a photograph of the check recovered by Westfield Police Department referenced in paragraph 10. The next day Chettri messaged a screen shot of his phone showing "Access Declined."

33. On November 6, 2018, Bishwajeet Jha sent Chettri a photo or screenshot of a Wire Transfer Request Form showing that J.H. authorized St. Anne's Credit Union to wire $38,500 to an account of Vishal Chettri at Bank Newport. The form was dated November 5,

2018. Chettri responded with a screenshot of what appears to be an internet page saying "Access Declined."

34.    On November 8, 2018, Bishwajeet Jha messaged Chettri, "Vishal send me details" and "of citizens bank." Chettri responded with information related to an account in his name at Citizens Bank. The next message in the chain came two days later and involved Bishwajeet Jha sending the information regarding J.A. of Falls Church, VA.[1] The information included a tracking number, the amount of $59,200, and "Fedex priority overnight."

35.    On November 14, 2018, Chettri messaged Bishwajeet Jha a screenshot of bank account xxxx8655 (the last four of the account number of the Citizens Bank account he previously provided to Jha) showing that $59,200, which was deposited on November 13, 2018, was on hold in the account.

36.    On November 19, 2018, Chettri messaged a recording of a conversation he had with Savings Institute Bank & Trust Customer Service to Bishwajeet. In the message he checked

---

[1]    On November 27, 2018, Det. Moody spoke with victim, J.A. She stated that on November 4, 2018 she received a pop up screen on her computer informing her that her computer was infected and that she needed to contact the provided phone number. She called the number and spoke with an individual who said they worked for EZ Web Solutions/CPT Network Solutions and that they could come out to her apartment and fix her computer for $600. She agreed to pay the $600 and provided her bank account information.

On November 9, 2018 the company did not come out to perform the task so they contacted her and informed her that they were going to issue her a refund for the $600. She stated the company mistakenly sent her a refund for $60,000 and requested that she send them a refund in the form of a Cashier's Check for $59,200 and that she could keep the extra $200 for her troubles. The company told her to make the check out to Vishal Chettri and to mail to 5 Enterprise Court in Newport RI. She went to BB&T and obtained a cashier's check (#1001491229) for $59,200 which was withdrawn from her bank account.

She said she received an alert from BB&T Bank later that day that an unauthorized person was moving money between her account and her father's bank account for whom she has Power of Attorney. She said the IT Company apparently transferred $60,000 from her father's account into her account to make it look like they had mistakenly refunded her the money.

BB&T has since blocked her account from further fraudulent activity. The money is currently in Vishal Chettri's Citizen's Bank account, which has been frozen.

with the bank representative about the status of his "check deposit." This message was sent at approximately 1:11 p.m. Detectives executed the search warrant at 5 Enterprise Court later that day.

37.    While most of the conversation in the chain is in phonetic Hindi, there were references to "Josh" and "Seenu," two other residents of 5 Enterprise Court believed to be involved in the scheme.

**The Group WhatsApp Conversation**

38.    Detectives observed a lengthy group conversation between Bishwajeet Jha, Sumit Jha, Joshua Lalrempuia, Vishal Chettri, and an individual identified as Abhay Mishra.[2] This conversation included messages in English and in phonetic spellings of Hindi. During the conversation, Mishra shared bank information and victim information with the other members of the group. Mishra created the group on October 29, 2018. Immediately thereafter, Bishwajeet Jha joined the group. On November 2, 2018, Bishwaheet Jha provided Chettri's contact information and instructed, "Add him." Within minutes, Chettri joined the group.

39.    After Chettri joined the group, Mishra messaged, "Vishal account details." Bishwajeet Jha responded in phonetic Hindi. A few messages later, Chettri messaged, "All right" and Mishra responded, "Atm card mila h??" The next day, November 3, 2018, Bishwajeet Jha messaged Chettri's account information for an account ending in 4723 at Bank Newport.

---

[2] None of the individuals interviewed referenced or mentioned Abhay Mishra, yet it is clear from the content of the WhatsApp conversations that Mishra was an integral participant in the scheme providing the others with victim information and information regarding incoming funds. Mishra also requested that the others provide him with information regarding their activity after receipts of the funds.

Brief Hindi conversation followed. On November 5, 2018, Chettri messaged a screen shot of what appears to be his Bank Newport account ending in 4723 and showing a balance of $25.

40. On November 8, 2018, 919163474093@s.whatsapp.net joined the group. 919163474093@s.whatsapp.net is believed to be Lalrempuia. The user name associated with that WhatsApp identifier in Bishwajeet Jha's phone is "Joshualrp." I served a subpoena on WhatsApp for subscriber information associated with that identifier. According to WhatsApp, the registered email address is Joshua.rempuia12345@icloud.com and the device associated with it is an Apple iPhone 6 Plus.

41. Immediately after Lalrempuia joined the group conversation, Mishra messaged, "Everyone send me their all active accounts." He later sent, "All active accounts only." Then, "You people are there ??" Followed by, "I said I need accounts."

42. Bishwajeet Jha then sent account information for the four of them (Lalrempuia (TD Bank), Bishwajeet (Santander and TD Bank), Sumit (Santander, Citizens Bank, and Bank Newport), and Chettri (Citizens Bank)) beginning with Lalrempuia.

43. Mishra responded with four images – the first appeared to be a computer screen shot related to a wire transfer and provided a Citibank reference, the second was a photograph of D.O.'s driver's license, the third was another computer screen shot that provided information about a $24,800 wire on November 8, 2018; and the fourth looked like a computer screen shot that listed "Sender Information" as D.O. of Sleepy Hollow, NY and "Beneficiary Information" as "Joshua Lalrempuia, 5 Enterprise Court, Newport, RI 02840." Det. Lavallee's interviews with D.O. were summarized in paragraph 29a.

15

44.     After Mishra sent this information, "Joshualrp" replied, "bhai, this is the only active acc i have right now." He continued, "have to wait for my debit card for samtander" and "Santander". Bishwajeet Jha messaged, "Ok" and "I already give don't worry". Mishra then sent, "Joshua 24800 received Cash withdrawal – 5000$ Wire – 19700$ Leave in acc – 50$". "Joshualrp" replied, "copy that bro."

45.     Mishra then sent a picture of a proof of a $39,100 wire transfer to Sumit Jha from D.B. of Sonoma, CA. Bishwajeet Jha messaged, "I will explain to Joshua," and "Joshualrp" replied, "got it bro" and "Thanks". Mishra messaged, "Deleted by the sender," "That's for sumit brother," and "Check your that 4 pics see the details of sender." Mishra then sent several messages with information that appeared to reference wire transfers from D.B. to Sumit Jha and from J.A.F. of Clovis, N.M. to Bishwajeet Jha. Mishra specified the amount received, "29600" and "39100" and then the amount of cash withdrawal, the amount of wire, and the amount to leave in the account. "Joshualrp" responded, "ohhh okay." A few hours later, on November 9, Mishra sent information regarding details for conducting the wire transfer.

46.     There were additional messages within the group between November 9 and November 13 that appeared to relate to the scheme. Some of the text was in phonetic Hindi. On November 13, Mishra messaged, "Vishal" "Contact me asap." The next message was on November 15 when "Joshualrp" messaged, "whats the detail?" "@918928454510." This number is Mishra's WhatsApp identifier and is believed to be his Indian telephone number. Mishra replied, "Ill give u in a while." A blank message came in from "Joshualrp" and the group conversation ended.

**The WhatsApp Conversation Between Bishwaheet Jha and Lalrempuia**

47. Another conversation recovered from Bishwajeet Jha's cell phone was a conversation between him and "Joshualrp." The messages began on October 28, 2018 and continued until November 17, 2018, two days before the search warrant. During the exchange on November 5, "Joshualrp" sent Bishwajeet Jha his bank information and Santander and TD Bank. A little later Bishwajeet messaged, "Send me the screenshot of Td bank one" "Josh." "Joshualrp" sent a screen shot of a TD Bank account balance of $21. On November 8, "Joshualrp" sent a screen shot of a TD Bank account balance of $24,806 with pending transactions of $24,785. There were more messages that appeared to be about banking and then on November 15, "Joshualrp" sent Bishwajeet Jha a screenshot of a wire transfer agreement showing that he Lalrempuia had transferred $19,700 to US OffPrice on November 15, 2018. This transfer contradicts Lalrempuia's claim to agents that he had told Bishwajeet Jha 2 – 2 ½ weeks prior to his November 20 interview that he wanted "out."

48. On November 16, 2018, "Joshualrp" messaged Bishwajeet Jha, "done bro." Bishwajeet Jha asked for his $100. "Joshualrp" responded the next day on November 17, "for what bro?" and then, "i thought the money was only for abhay" (believed to be a reference to Abhay Mishra). Bishwajeet Jha responded, "Ok leave it." "Joshualrp" said, "ok" "bro" and the exchange ended. This conversation contradicts Lalrempuia's statement to detectives that he got "out" of the scheme 2 – 2 ½ weeks prior to the November 20 interview and it also contradicts his claim that only Bishwajeet, Sumit, Chettri and himself were involved.

**WhatsApp Conversation referencing Itape**

49. While reviewing the forensic data extracted from Bishwajeet's IPhone, detectives observed several conversations referring to Srinivas Itape, who was also a resident of 5

17

Enterprise Court. In the conversations, the conspirators referred to Itape as "Seenu." I believe this was a reference to Itape based upon Det. Moody's interview of another resident of 5 Enterprise Court, Gideon Lopes. Lopes said that Srinivas Itape was also known as Seenu Itape.

50.    On November 9, 2018, Bishwajeet Jha sent Abhay Mishra a video of Jha speaking with a bank employee. In this conversation the bank employee explains that Jha's account activity is causing the bank concern. About 45 minutes later, Jha sent Mishra contact information for "Seenu" with number (401) 275-3024 (the number of Device 2). Much of the ensuing conversation is in phonetic Hindi but appears to relate at least in part to bank transactions based upon the screen shots shared.

51.    In the same WhatsApp conversation, on November 13, 2018, Abhay messaged, "49.5 k done" followed by "Receiver details   Name – Srinivas Itape   Address – 5 Enterprise court, Newport, RI   Bank Name –Citizens Bank." Further in the same message, Mishra provided the customer name of D.B. from Niles, Illinois, a victim of the scheme.

**WhatsApp Conversation Between Itape and Bishwajeet Jha**

52.    On November 9, 2018, Bishwajeet Jha and Srinivas Itape, using Whatsapp identifier, 14012753024@s.whatsapp.net, began a conversation chain that ended on November 19, 2018. Bishwajeet shared the contact name for "Abhay India" (same ID number as Abhay Mishra) with Srinivas Itape.

53.    In the same chat conversation, on November 13, 2018, Itape sent a screenshot of his bank account online and Bishwajeet Jha replied with "Customer details" of D.B. of Niles, Illinois. Three minutes later Bishwaheet Jha messaged, "49.5 k done." Shortly thereafter, Itape messaged, "Ok" and "But not received." Interspersed in the conversation are messages in phonetic Hindi.

18

54.     The conversation chain ended on November 19, 2018 at approximately 1:10 p.m. The warrant was executed at 5 Enterprise Court later that day.  The last message was from Itape to Jha was a video of Itape logging into an account online.

**Location of Device 1 and 2**

55.     Device1 is currently in the lawful possession of HIS in Rhode Island.  It came into Newport Police Department custody when Lalrempuia provided it to detectives during his interview, and detectives subsequently turned the device over to HSI.  In my training and experience, I know that Device 1 has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when Device 1 first came into the possession of the law enforcement.

56.     Device 2 is believed to be in the possession of Itape.  Detectives and/or I plan to attempt an interview of Itape in Rhode Island.  During this interview, we expect Itape to be in possession of Device 2 because we know based on our experience that most individuals carry their cell phones on their person.  I seek authorization for law enforcement to seize Device 2 at that time and later search the device.

## TECHNICAL TERMS

57.     Based on my training and experience, I use the following technical terms to convey the following meanings:

  a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of

19

transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of numbers or numbers and letters, separated by periods or colons (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

22

g.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

58.    Based on my training, experience, and research, and from consulting with other agents and detectives, I know that the Devices have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of these types can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

59.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

60.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

23

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

24

f.   The electronic devices may be an instrumentality of the crime because they were used as a means of committing the criminal offense.  The electronic devices are also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

61.    *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

62.    *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession as to Device 1, the execution of this warrant does not involve the physical intrusion onto a premises as to that device.  Further, because the warrant seeks permission to seize Device 2 during law enforcement's interview with Itape, the warrant does not involve the physical intrusion onto premises unless invited, and any subsequent search would be conducted after Device 2 was in law enforcement's possession.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrants at any time in the day or night.

## CONCLUSION

63.     I submit that this affidavit supports probable cause for search warrants authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.

64.     I further submit that this affidavit supports probable cause for the issuance of arrest warrants for Joshua Lalrempuia and Vishall Chettri for violations of 18 U.S.C. § 1341, 1343, 1344, 1349, and 1028A.


RACHEL L. ROBINSON
Special Agent
Homeland Security Investigations


Subscribed and sworn to before me
on December 4, 2018:

LINCOLN D. ALMOND
UNITED STATES MAGISTRATE JUDGE

26